## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Martin Martinez, | |
| Plaintiff, | Case No. 3:18-cv-50164 |
| v. | Honorable Iain D. Johnston |
| Wexford Health Services, Inc., Cathy Smith, Dr. Tim Chamberlain, Amber Allen, Dr. Jill Wahl, Dr. Arthur Davida, Correctional Officer Tyler Horner, | |
| Defendants. | |

### MEMORANDUM OPINION AND ORDER

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to determine whether a plaintiff will win the case. Here, Martinez, through recruited counsel, clears this hurdle as to some defendants and not others. Therefore, Defendants' motion to dismiss [114] is denied in part and granted in part. Whether Martinez's remaining claims will survive a summary judgment motion is left for another day.

\*     \*     \*

On October 21, 2020, Plaintiff Martin Martinez filed a third-amended complaint suing Wexford Health Sources, Inc. ("Wexford"), Amber Allen, Cathy Smith, Dr. Tim Chamberlain, Dr. Jill Wahl, Dr. Arthur Davida, and Correctional Officer Tyler Horner. Dkt. 111.

Wexford is a private corporation that has contracted with the Illinois Department of Corrections to provide its inmates with medical care. *Id.* ¶ 14. Cathy

1

Smith was the individual responsible for scheduling, coordinating, and managing offsite medical procedures. This included inmate transportation. *Id.* ¶ 15. Dr. Tim Chamberlain was a Wexford-employed physician that was heavily involved in Martinez's medical care during his incarceration. *Id.* ¶ 16. Dr. Jill Wahl and Dr. Arthur Davida were also Wexford-employed physicians. *Id.* ¶¶ 18–19.

Martinez alleges that these Defendants violated his Eighth Amendment rights and conspired to violate the same. Defendants Amber Allen and Tyler Horner filed an answer to the third-amended complaint. Dkt. 123. Defendants Wexford, Dr. Tim Chamberlain, Dr. Jill Wahl, Dr. Arthur Davida, and Cathy Smith filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state claim. Dkt. 114.

## I. Allegations

### A. Knee Issue

Plaintiff Martin Martinez was incarcerated with the Illinois Department of Corrections at the Dixon Correctional Center in 2007. He was then released in October 2018. Dkt. 111, ¶ 1. In 2009, during this incarceration, Martinez injured his knee, requiring surgery. *Id.* ¶¶ 2, 23. That surgery occurred in April 2011, but Martinez continued to suffer from knee pain even after the surgery. *Id.* ¶¶ 23–24. A few months later, in December 2011, Martinez's orthopedic surgeon recommended he return for additional treatment if his pain was not resolved through physical therapy. The pain did not improve. *Id.* ¶ 25. The alleged timeline is a bit confusing. But the reasonable inference is that Martinez's specialist recommended a follow-up

visit. Still, follow-up care was delayed until September 2012, and even then, Martinez was not sent to the requesting physician. *Id.*

The physician that Martinez saw in September 2012 referred him to another physician and recommended that this be done within three or four weeks. *Id.* ¶ 26. That did not happen. Instead, Martinez was not afforded the recommended care for five months—on April 8, 2013. *Id.* At that time, Martinez was examined by Dr. Chmell, who recommended an MRI, which would be followed up with a post-MRI examination. *Id.* ¶ 27. Despite Dr. Chmell's assessment and recommended treatment, Martinez was not afforded the MRI for another six months, in October 2013. *Id.* ¶ 28. Even then, Martinez was not provided the results of the MRI until March 2014, almost a year after the MRI was ordered. *Id.* On review of the MRI, Dr. Chmell explained that Martinez might require a knee replacement surgery, but in the meantime, the best course of action was physical therapy, a cortisone injection, and a follow-up examination in six months. *Id.*

Six months came and went with no follow-up examination. Martinez was not afforded his examination with Dr. Chmell until June 22, 2015, fifteen months after the last visit and nine months later than Dr. Chmell had ordered. *Id.* ¶ 29. During this delayed visit, Dr. Chmell examined Martinez's knee and recommended another surgery. He scheduled that surgery for September 22, 2015 and advised that Martinez needed to return within thirty days of surgery for a pre-surgical assessment. *Id.* ¶ 29. Again, that did not happen. For some reason, Martinez was

not transported to the appointment. *Id.* ¶ 30. Because he missed the pre-surgical assessment, the surgery had to be postponed.

Because of the delay, his pre-surgical assessment did not occur until October 26, 2015. The surgery then was scheduled for December 29, 2015, and another pre-surgical assessment was required within the thirty-day window. *Id.* ¶ 31. Again, that did not happen. This series of events continued; Martinez was again scheduled for surgery, this time on June 21, 2016, with another pre-surgical visit required. *Id.* ¶ 32. Though the pain persisted, so did the delays; these dates were again missed. *Id.* ¶ 34. Martinez alleges that he asked about the surgery schedule multiple times between December 2015 and July 2016. Each time, he was "advised that it was in process and that appointments were being made, despite surgery being scheduled on three prior occasions and Defendants' failure to follow the recommendations" of Martinez's specialty physicians. *Id.* ¶ 35. For reasons not known to the Court, Defendants' wrote Martinez a disciplinary ticket when he continued asking for a written explanation why they repeatedly failed to transport him to these recommended medical appointments. *Id.*

Finally, Martinez was afforded his pre-surgical visit and received the recommended surgery on August 18, 2016; nearly a year after the originally scheduled date. *Id.* ¶ 37. Throughout this delay, Martinez continued to suffer pain in his knee. Still, the medical team failed to adjust his medication to deal with the pain.

Unfortunately for Martinez, the pain continued after his surgery. And he was not afforded a post-operative follow-up examination until two months after the surgery—on November 14, 2016. There, the specialist gave Martinez a cortisone injection and recommended a follow-up examination in three months. *Id.* ¶ 39. But, again, that did not happen. And, again, Martinez was not afforded the follow-up examination until October 30, 2017—eight and a half months late. *Id.* ¶ 40.

## B. Wrist Issues

Martinez also alleges delayed treatment for his wrist injury. In May 2015, he allegedly complained of pain in his wrist, which he asserted was due to the use of black box handcuffs. *Id.* ¶ 42. In response, he was given an x-ray, which he contends "revealed he suffered from a medical condition that warranted further work up and treatment." *Id.* Still, Dr. Chamberlain limited that treatment to an ACE wrap.[1] *Id.* ¶ 43. Martinez alleges that he next asked for treatment of his wrists in February 2016, but that Dr. Chamberlain asserted that he had not evaluated Martinez's wrists and referred him to sick call. That is a little confusing given the allegation that Dr. Chamberlain previously treated with an ACE wrap. *Id.* ¶ 44.

Regardless, Martinez asserts that Dr. Chamberlain was concerned about a potential nerve issue with Martinez's wrists in May 2016. Dr. Chamberlain then decided to delay treatment, however, until the knee could be surgically repaired. *Id.* ¶ 45. Martinez contends that this delay subjected him to unnecessary pain and disability (including swelling and numbness, *id.* ¶ 46). Martinez again complained

---

[1] An ACE wrap is an elastic bandage, which uses stretchable material to provide localized compression. *Elastic bandage*, Stedman's Medical Dictionary (2014 ed.).

of wrist pain in October 2016 and again asked why his treatment had been delayed. He was then prescribed physical therapy for the wrist injury on March 27, 2017. *Id.* ¶ 47. But that physical therapy did not resolve the problem. *Id.* ¶¶ 49–50. About three months later, Martinez was referred to a neurologist, because of a suspected nerve injury (consistent with Dr. Chamberlain's opinion from thirteen months before). *Id.* ¶ 50.

Still, that referral did not take place for another ten months. *Id.* ¶ 51. At that time, the neurologist recommended a nerve conduction study. But that study was delayed another four months. *Id.* ¶ 52. It revealed that Martinez suffered from carpal tunnel syndrome in both wrists. *Id.* ¶ 53. Despite this diagnosis, Martinez contends that he was not provided "definitive treatment" for the carpal tunnel. *Id.* ¶ 54.

Although Martinez has since been released from custody, he brings this suit to recover for alleges violations of his constitutional rights under the Eighth Amendment. Before the Court is a motion to dismiss his claims against Wexford Health Sources, Dr. Tim Chamberlain, Dr. Jill Wahl, Dr. Arthur Davida, and Cathy Smith. Dkt. 114.

## II.    Analysis

To defeat a motion to dismiss, the plaintiff must have alleged facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This means that a plaintiff's well-pleaded factual allegations must allow "the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 622, 678 (2009). The Court accepts as true all of the plaintiff's well-pleaded allegations and views them in the light most favorable to the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019).

The burden of persuasion on a motion to dismiss rests with the defendant. *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008) ("On a motion to dismiss, defendants have the burden of demonstrating the legal insufficiency of the complaint – not the plaintiffs or the court."). And although a plaintiff must raise the plausible inference of liability, Rule 8 does not require him to plead facts that he cannot know without discovery. *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 768 F.3d 510, 529 (7th Cir. 2015).

## A. Group Pleading and Personal Involvement

As an initial matter, Defendants argue that Martinez has engaged in impermissible group pleading. Dkt. 114, at 5. But that argument is too broad. Group pleading is permissible is some circumstances, and not in others. In other words, engaging in group pleading is not per se improper. *Sibley v. Dart*, No. 17-cv-6298, 2019 U.S. Dist. LEXIS 26195, at *12 (N.D. Ill. 2019) ("But at the motion to dismiss stage, Plaintiff's group pleading—although not ideal—is not prohibited."); *see also Bailey v. Mansfield Indep. Sch. Dist.*, 425 F. Supp. 3d 696, 713 (N.D. Tex. 2019) ("Although Defendants correctly note that Bailey, at times, lumps Defendants together as a group, read in the context of her other allegations, the instances of

group pleading have not prevented the court from discerning which defendants are allegedly responsible for which allegedly unlawful acts.").

Rather, the underlying analysis is whether the complaint, as a whole, creates the plausible inference that each defendant is liable for the act complained of. If any group pleadings, taken along with any individual pleadings, create such a plausible inference, then the complaint is sufficient and survives a motion to dismiss. On the other hand, if the group allegations, combined with any individual allegations and reasonable inferences, fail to put a specific defendant on notice as to their alleged personal involvement in the injury, the Court must grant that defendant's motion to dismiss. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy."); *see also Minix v. Canarecci*, 597 F.3d. 824, 833 (7th Cir. 2010) (discussing the personal involvement requirement). Critically, although Martinez engages in some group pleadings against some defendants, there are no defendants who have solely been lumped into an undifferentiated amalgam of "defendants".

In the present case, Martinez's allegations are sufficient as to some defendants and not as to others.

As to Drs. Jill Wahl and Arthur Davida, the Court finds insufficient allegations to put them on notice. Martinez alleges that Dr. Wahl was employed by Wexford and provided medical care to him. Dkt. 111, ¶ 18. He alleges that she was

8

aware of his conditions and failed to provide treatment. He alleges the same against Dr. Davida. *Id.* ¶ 19. That is it. Martinez fails to include any further factual allegations that could support his other conclusory allegations. Without more, the Court is left to speculate whether these doctors are liable for anything. The complaint paints a picture in which Dr. Chamberlain is the primary Wexford physician treating Martinez. Nothing in the complaint raises the inference that Drs. Wahl or Davida were responsible for treating any of the *relevant* conditions[2] or that they did. Therefore, the Court grants the motion to dismiss Drs. Wahl and Davida for failure to allege that they were personally involved in any constitutional injury.

The allegations as to Dr. Chamberlain and Cathy Smith, however, are sufficient to place them on notice as to their alleged involvement in any constitutional injury, if one indeed occurred. Martinez alleges that Smith was "responsible for scheduling, coordinating, and ensuring the completion of medical procedures outside of IDOC facilities and . . . for coordinating offsite transportation of inmates for medical treatment, including surgeries prescribed by surgeons." *Id.* ¶ 15. Although these allegations will have to be proven at a later stage, they are enough for now. Her alleged job responsibilities go to the heart of Martinez's complaint and are, therefore, sufficient to place her on notice of her involvement in his purported injury.

---

[2] Although Martinez does allege that Drs. Wahl and Davida were responsible for his medical care to some degree, he never alleges that they examined him for any of the medical conditions that are relevant to this suit.

The same is true of Dr. Chamberlain. Unlike Drs. Wahl and Davida, who Martinez merely alleges were aware of his conditions and neglected to intervene, he alleges that Dr. Chamberlain purposely delayed the wrist treatment. *Id.* ¶ 16, 43–46, 50, 84. Although these allegations that specifically mention Dr. Chamberlain are mostly concerned with his wrist injury, they provide a reasonable inference that Dr. Chamberlain was the main Wexford physician responsible for Martinez's care. That may not be proven in discovery, but for now, it is enough to place Dr. Chamberlain on notice of his plausibly alleged personal involvement in the constitutional injury, if one occurred. To be sure, the allegations specific to Dr. Chamberlain are sparse, but combined with the group pleadings and the reasonable inferences, they are enough.

## B. Eighth Amendment Deliberate Indifference

The Eighth Amendment does not provide a remedy for medical malpractice. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). But the Eighth Amendment does allow for recovery when a prison medical professional's decision is such a substantial department from the norm that he or she cannot be said to have exercised legitimate professional judgment. *Eagen v. Dempsey*, 987 F.3d 667, 683 (7th Cir. 2021); *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020). A substantial departure of this type might rise to an inference of punishment, which is the focus of the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 836-38 (1994); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir.

2016) ("But blatant disregard for medical standards could support a finding of mere medical malpractice, or it could rise to the level of deliberate indifference, depending on the circumstances.").

Federal courts ask (1) whether the inmate suffered from a serious medical need, and (2) whether the defendant demonstrated a sufficiently culpable state of mind by exercising deliberate indifference toward that serious medical need. *Perry v. Sims*, No. 19-1497, 2021 U.S. App. LEXIS 6165, at *8 (7th Cir. Mar. 3, 2021). This is not an easy task. The deliberate indifference standard requires an allegation that defendant's conduct manifested a serious lack of concern for the plaintiff inmate's welfare. *Rosario v. Brawn*, 670 F.3d 816, 821–22 (7th Cir. 2012). This is a subjective inquiry: a plaintiff will eventually have to prove that a defendant knew of the risk of harm and disregarded it. *Id.*

Here, Martinez includes Wexford Health Sources as a defendant in his § 1983 action. When plaintiffs proceed against a private corporation under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, (1978), they must allege that the private corporation's policy, practice, or custom was the direct cause or moving force behind the constitutional injury. *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004). Both a constitutional injury and causation are required. *First Midwest Bank v. Chicago*, No. 18-3049, 2021 U.S. App. LEXIS 5227, at *13-14, 21-22 (7th Cir. Feb. 23, 2021). *Monell* claims come in three forms: (1) the defendant employs an express policy that causes the constitutional injury, (2) the defendant has established a widespread practice that is so well settled that it constitutes a custom or usage, or

(3) the defendant has final policymaking authority and has caused the constitutional injury. *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). As is often the case, Martinez proceeds under the second option.

Martinez need not prove such a widespread practice at this point. Instead, he must allege facts that raise the plausible inference that such a widespread practice does exist and that it was the moving force behind the constitutional injury. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Hamilton v. Oswego Cmty. Unit Sch. Dist. 308*, No. 20 C 0292, 2021 U.S. Dist. LEXIS 36408, at *27 (N.D. Ill. Feb. 26, 2021) ("The existence of another lawsuit is not enough to state a claim that a defendant maintains a widespread practice. Plaintiffs point to one other case, but one other case is not enough."); *Sanders v. Chi. Transit Auth.*, No. 19-cv-04656, 2020 U.S. Dist. LEXIS 161701, *23–24 (N.D. Ill. Sept. 3, 2020) (requiring more than a bare allegation that a custom existed).

First, Martinez has stated an Eighth Amendment claim against the remaining individual defendants—Dr. Chamberlain and Cathy Smith. As stated above, this claim requires an allegation of deliberate indifference to a serious medical condition. Martinez has alleged multiple. Defendants do not challenge the serious nature of his knee condition. But they do contend that his wrist injury was not serious—though in a single and uncited sentence. Dkt. 114, at 7. Martinez's alleged wrist injury, however, was not a simple sprain or bruise. He alleges continued swelling, numbness, and nerve damage. That is an objectively serious

concern, especially when faced with the continued likelihood that the injury would be worsened by being handcuffed.[3]

For the deliberate indifference part of the test, Martinez mostly does not allege that he was denied treatment, and he does not have to. He alleges that Defendants' manifested deliberate indifference through their continual delays of his treatment. No doubt, the factual allegations are riddled with lengthy and unexplained delays. Time after time, Martinez's medical conditions were scheduled for treatment and then not timely treated. He consistently complained of pain. And even though his specialty physicians recommended treatment, Martinez was denied that treatment on the timeline recommended by his specialists. Martinez's allegations describe delays at every stage in the medical treatment process. Some of these delays were months; at times, he waited more than a year.

If Martinez complained of a single, short delay, then that might not be enough to state a claim for deliberate indifference. *See, e.g.*, *Redmon v. Doehling*, 751 F. App'x 900, 904 (7th Cir. 2018); *Berry v. Bunnell*, 39 F.3d 1056, 1059 (9h Cir. 1994) (minor delays with no harm do not constitute deliberate indifference); *Crouch v. Spaulding*, 16 CV 1435, 2019 U.S. Dist. LEXIS 12459, at *7-8 (N.D.N.Y. Jan. 24, 2019) (delays of minutes insufficient to show deliberate indifference). But he alleges much more.

---

[3] Unnecessary pain and suffering alone may be sufficiently serious for the purpose of an Eighth Amendment claim, even where it does not amount to "torture" or "lingering death." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

Although Martinez's complaint does not make clear exactly which doctor he saw on every occasion, he alleges sufficient involvement by Dr. Chamberlain to show that Dr. Chamberlain was aware of Martinez's various conditions and his pain from dealing with those conditions. And he alleges enough involvement by Dr. Chamberlain in the treatment of those conditions to raise the inference that Dr. Chamberlain was deliberately indifferent to those conditions. If Dr. Chamberlain took Martinez's conditions seriously, these continual and lengthy delays would likely not have occurred, at least under these factual allegations. Although the Court states no opinion as to the truth of these allegations, the Court holds that they are enough to raise the plausible inference of liability on the part of Dr. Chamberlain.

Unlike with the other two doctors, Martinez alleges specific instances in which Dr. Chamberlain examined him. Although these allegations are minimal and are mostly related to the wrist, they are enough to raise the inference that Dr. Chamberlain was personally involved in Martinez's treatment. That, combined with the continued failure to ensure his knee was timely treated as recommended by the specialists, is enough to state a claim for deliberate indifference to Martinez's knee condition—though barely.

The allegations are also enough to state a claim for deliberate indifference to Martinez's wrist injury. The initial delay in treating the wrist could be justified and explained by the existence of Martinez's knee injury: Dr. Chamberlain reasonably wanted to remove the use of a cane before performing surgery on the limb that must

14

operate the cane. If that was the end of the story, then Martinez would have failed to state a claim. But after almost two years of pain and suffering, Dr. Chamberlain treated the wrist with physical therapy. If that was the only treatment given, then waiting for the knee surgery seems less explainable. And that treatment did not fix the problem.

In June 2017, Martinez was referred to a neurologist for the wrist injury, thirteen months after Dr. Chamberlain first suspected a nerve issue. But even with that referral, Martinez was not afforded that consultation for another ten months. Thus, the significant and continued delays in treatment were not limited to the knee injury. The delays caused Martinez to continue suffering pain from both his knee and wrist injuries. That is enough to state a claim.[4]

These allegations are also enough to state a claim against Cathy Smith. The third-amended complaint alleges that she "was responsible for scheduling, coordinating, and ensuring the completion of medical procedures outside of IDOC facilities and she was responsible for coordinating offsite transportation of inmates for medical treatment, including surgeries prescribed by surgeons." Dkt. 111, ¶ 15. This goes to the heart of Martinez's claims. Because his claims are rooted in delays and failures to transport him to outside appointments, Cathy Smith's job responsibilities raise the plausible inference that she is liable for Martinez's

---

[4] Defendants also contend that the use of black box handcuffs is not actionable under § 1983. Dkt. 114, at 6. That argument misses the point. Martinez does not sue for the general use of such handcuffs. He sues for the use of those handcuffs at a time when he had carpal tunnel syndrome. In other words, he does not challenge the use of black box handcuffs on the whole, he contends that the continued use of such handcuffs when they exacerbate a medical problem constitutes deliberate indifference.

constitutional injury. Although Dr. Chamberlain may have been responsible for ensuring the proper treatment of his patient, Cathy Smith was plausibly responsible for coordinating and managing that treatment.

Second, Martinez has stated a *Monell* claim against Wexford Health Sources. Contrary to Wexford's contention, Martinez's allegations are more than merely conclusory. As a foundation to his allegations, Martinez incorporates a consent decree from another court in this District.[5] Dkt. 111, ¶ 77. "In October 2018 the Court-appointed medical experts prepared a report of their findings of Wexford's compliance with minimal constitutional standards of adequacy for the period of 2014 to 2018, the relevant time period in Plaintiff's complaint." *Id.* That report included issues with the process of accessing specialty care. It noted a lack of adequate tracking of the timeliness of such care—and further noted that Wexford's failures often result in "a barrier to timely care" and that such delays "has harmed patients." *Id.* ¶ 78. Furthermore, "[p]atients are not consistently referred for specialty care when it is warranted," which the medical experts felt was "a problem of hiring unqualified physicians and . . . of the utilization process itself." *Id.*

---

[5] In reply, Defendants argue that the Court should not consider the allegations regarding the consent decree. They contend that the report is irrelevant and routinely barred as evidence by other courts. Notably, the court opinion they cite to was at the summary judgment stage. There, the court explained that the report did not qualify for judicial notice. *Diaz v. Chandler*, No. 3:14-cv-50047, 2016 U.S. Dist. LEXIS 35450, at *39–40 (N.D. Ill. Mar. 18, 2016). To begin, this case is not at the summary judgment stage, and the Court is not determining whether to take judicial notice of the report. At this point, the references to the report are nothing more than allegations. Further, provided counsel engages in a reasonable inquiry, there is nothing inherently wrong in relying on hearsay to state a claim. Fed. R. Civ. P. 11(b); *Lewis v. City of Chicago*, 235 F. Supp. 3d 1029, 1031 (N.D. Ill. 2016).

Effectively, what Martinez alleges is that his circumstances are but one example of a larger problem with the medical services Wexford provides Illinois inmates. He does not do this in conclusory fashion. His allegations regarding the consent order give substantial reasons why his claims of a widespread custom are plausible. Although the Court states no opinion on the merits of Martinez's claims, his allegations are enough to raise the plausible inference that Wexford maintains a widespread custom that directly causes constitutional harm to the inmates in its care and that Martinez was one of those inmates.[6]

## C. Conspiracy

Martinez also brings a claim of conspiracy to deprive his constitutional rights against the various individual defendants. Dkt. 111, at 18. Such a claim is actionable when defendants agree to deprive the plaintiff of his constitutional rights and then take overt acts in furtherance of that deprivation. *Daugherty v. Harrington*, 906 F.3d 606, 612 (7th Cir. 2018). But those overt acts must have actually deprived the plaintiff of his or her constitutional rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Of course, at the pleading stage, a plaintiff need only allege facts creating the plausible inference that the defendants are liable.

---

[6] With that said, Martinez has only stated a *Monell* claim related to his time at Dixon Correctional Center. If he means to state a *Monell* claim regarding how care is provided across prison facilities, he has failed to do so. He has not alleged that he was ever transferred between facilities, and thus, any such claim would have nothing to do with him. The *Monell* claim that survives is specifically that the delays in his treatment are attributable to a widespread custom within Wexford at Dixon Correctional Center that results in untimely treatment of inmate medical needs to a degree that manifests deliberate indifference.

17

Defendants argue that Martinez's conspiracy allegations are "nothing more than rote, unadorned, and formulaic recitations of the elements of a claim for conspiracy." Dkt. 114, at 13. Not so. To state a claim for conspiracy, a plaintiff need only identify the parties to the alleged conspiracy, their purpose, and the approximate date of the conspiracy. *Miller v. Fisher*, 219 F. App'x 529, 533 (7th Cir. 2007) ("But Miller did not have to provide facts to support his conspiracy claim, other than to identify the parties, purpose, and approximate date of the conspiracy."); *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002).

Martinez has done that. He alleged that the individual defendants acted in a conspiracy to delay his medical care, and he laid out the dates of those delays. Given that he has cited to a consent decree that describes a culture of widespread delay and inadequate treatment, his conspiracy allegations at least state a claim against Dr. Chamberlain and Cathy Smith. But as stated above, Martinez has not alleged personal involvement by Drs. Wahl and Davida. That lack of sufficient allegations extends to any claim against them for conspiracy.

## III.   Conclusion

For the reasons explained above, Defendants' motion to dismiss [114] is granted in part and denied in part. Defendant Drs. Wahl and Davida are dismissed without prejudice to rejoin them if discovery reveals their personal involvement, so long as the amendment occurs before any case management deadline. In the meantime, this action will continue against Cathy Smith, Dr. Chamberlain, and

Wexford Health Sources, Inc., as well as the other defendants that did not move for dismissal.

Date:  April 20, 2021

_____
Honorable Iain D. Johnston
United States District Judge
Northern District of Illinois
Western Division